UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-62069-CIV-ROSENBAUM/SELTZER

NESTOR ROBLES, JOVANNI ULLOA,
and CLAUDIA VAZQUEZ,

    Plaintiffs,

v.

RFJD HOLDING CO., INC., d/b/a Emmaculate
Reflections, and GERALD DONATH,

    Defendants.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment [D.E. 51] and Defendants' Motion for Summary Judgment [D.E. 56]. Both motions essentially require the Court to resolve the same question: Are Plaintiffs "employees" as that term is defined in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*? The Court will therefore consider both Motions together. Plaintiffs also seek summary judgment declaring that Defendants' violations of the FLSA were willful.

The Court has reviewed the parties' motions and briefs and considered the evidence of record and is otherwise fully informed in this matter. For the reasons set forth below, the Court grants in part and denies in part Plaintiffs' Motion and denies Defendants' Motion. Specifically, the Court finds that Plaintiffs are employees protected by the FLSA. The Court cannot conclude, however, that Plaintiffs have established that Defendants' alleged violations were willful.

# I. FACTUAL BACKGROUND

Plaintiffs Nestor Robles, Jovanni Ulloa, and Claudia Vazquez have brought this suit under the FLSA to recover unpaid minimum and overtime wages from Defendants RFJD Holding Company, Inc.—doing business as Emmaculate Reflections ("Emmaculate")—and Gerald Donath, the company's Chief Executive Officer. D.E. 9; D.E. 56-3. Emmaculate is a commercial cleaning business that specializes in restaurant cleaning. D.E. 56-3, ¶ 3. Emmaculate's business model involves contracting with restaurants to supply their cleaning needs and then hiring what it terms as "subcontractors" to do the actual cleaning. D.E. 56-3.

Plaintiffs Robles and Ulloa cleaned Emmaculate's customers' restaurants from June 2010 to August 2011. D.E. 53-4 at 31-32. During this period, Robles and Ulloa worked exclusively for Emmaculate. D.E. 51-1, ¶ 56. Plaintiff Vazquez cleaned at one of Emmaculate's customer's restaurants for ten days in September 2009. D.E. 51-1, ¶ 49. According to Defendants, Robles and Ulloa cleaned restaurants assigned by contracts to Clara's Company, a cleaning subcontractor owned by Robles's brother. D.E. 56-2, ¶ 15. Robles and Ulloa were paid for their cleaning work through checks issued to Clara's Company by Emmaculate. D.E. 68-1, ¶ 28. The restaurant Vazquez allegedly cleaned was assigned by contract to Lando Cleaning, owned by Manuel Camacho. D.E. 56-2, ¶ 43. Robles and Ulloa claim that they were generally paid nothing during the final weeks that they cleaned Emmaculate's customers' restaurants. D.E. 9, ¶ 43. Vazquez contends that she was paid nothing for her ten days of work. *Id.* ¶ 44.

Defendants contend that Plaintiffs were independent contractors, in business for themselves or through the subcontractor entities,[1] and are not covered by the FLSA. Plaintiffs maintain that the

---

[1] Plaintiffs also devote substantial portions of their briefs to arguing that Emmaculate and the subcontractor entities, Clara's Company and Lando Cleaning, would be "joint employers" under the FLSA, although Plaintiffs disclaim that either entity actually employed Plaintiffs. *See* D.E. 51 at 8.

nature of their working relationship with Defendants demonstrates the existence of an employee-employer relationship, despite the labels and formalities that Emmaculate used.  Plaintiffs also contend that the evidence of record supports a finding that Defendants' alleged violations of the FLSA were willful.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009).  The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007).  Nor does the Court determine the credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted).  Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of

---

However, the  question before the Court is not whether Emmaculate and another entity jointly employed Plaintiffs but rather whether Emmaculate employed Plaintiffs at all.

material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103

n.6 (11th Cir. 2004).

## III. ANALYSIS

### A. Plaintiffs' Employee Status

The FLSA broadly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "employ" is defined with similar breadth as "to suffer or permit to work." *Id.* § 203(g). Therefore, to give effect to the FLSA's remedial purposes, courts have adopted an expansive definition of "employee." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976). The determination of a plaintiff's employment status under the FLSA is a question of law. *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996).

To determine whether an individual is a protected employee or an unprotected independent contractor, courts look at the "economic reality" of the employment circumstances as a whole. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 782 (11th Cir. 2006). Courts have outlined several factors to be considered in the economic-reality inquiry. These factors include the following:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Freund*, 185 F. App'x at 783 (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir.

1987)). While these factors are useful in guiding a court's analysis, no single factor outlined above is dispositive of the touchstone issue in the economic-reality inquiry: whether the alleged employee is economically dependent on the alleged employer or whether, instead, the alleged employee is in business for him or herself. *Freund*, 185 F. App'x at 783; *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1284 (M.D. Fla. 2006); *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1318-19 (S.D. Fla. 2001).

1. Control of the Manner of Performing Work

Both parties here point to a number of facts that each believes is relevant to evaluating the nature and degree of control that Defendants exercised over Plaintiffs' performance of their cleaning duties. Plaintiffs contend that Defendants trained and closely supervised Plaintiffs' activities. D.E. 51 at 4; D.E. 68 at 7. Defendants counter that they were concerned only with "customer satisfaction" and not the day-to-day regulation of Plaintiffs' "work habits, hours worked, or work methods." D.E. 67 at 6 (citing *Freund*, 185 F. App'x at 783).

Plaintiffs cite numerous examples of Defendants' close supervisory control of Plaintiffs' work. For example, Plaintiffs Robles and Ulloa assert that Defendants' supervisory employees told them "what to clean, how to clean, what to clean with, when to clean, and how to improve the final product." D.E. 55-2 at 12; D.E. 55-3 at 12. Additionally, Ulloa testified during her deposition that supervisors frequently made detailed suggestions about how she was supposed to clean. In one instance, her supervisors told her to use a brush to clean a certain type of floor, instructed her that she was not to use a too-wet mop on another type of floor, warned her that she must not use a certain type of equipment to clean windows, and advised her how to clean the windows. D.E. 53-2 at 72:2-74:20. Although Ulloa does not indicate which supervisor specifically gave her this direction, she notes that supervisors Leonardo Caberea and Herb Stewart were the ones who most frequently

6

supervised at the Solita restaurant, while Stewart, Jose Rodriguez, and Gustavo Correra supervised at the Manor restaurant. *Id.* at 71:15-:19, 72:20-:22, 73:22-:25, 74:5-:10. Plaintiff Robles similarly testified that the supervisors instructed and closely supervised Plaintiffs at each job site initially, D.E. 53-4 at 86:4-:8, 88:11-:18, and provided directions on specific methods for cleaning particular windows or floor surfaces and the types of cleaning products to be used, *id.* at 166:8-167:4.

Plaintiff Vazquez's interrogatory answer asserts that she was supervised daily. D.E. 55-1 at 10. Similarly, Vazquez testified that Defendants' supervisor would direct her concerning what to clean "and what liquids we need to use." D.E. 52-1 at 125:2 - :19. Although Vazquez recalled that multiple supervisors regularly oversaw her work, she could not remember any specific supervisor's name. *Id.*; D.E. 52-2 at 65:21-66:1.

Defendants contend that its supervisors supervised in only the "loosest sense." D.E. 67-1 at 5. However, it is undisputed that Defendants' front-line supervisors were responsible for, among other things, orienting the subcontractors to their initial job and to any new jobs they took on, conducting periodic inspections of the restaurants, and "monitor[ing] the subcontractor's compliance with their contract." D.E. 56-2, ¶ 12. Each supervisor was responsible for approximately thirty to forty restaurants. *Id.* Regarding the supervision of Plaintiffs particularly, Defendants point to the deposition of Juan Sotelo, who testified that he did not recall supervising any of the Plaintiffs. D.E. 53-3 at 9:4-12:9. Nevertheless, Sotelo confirmed that Defendants' supervisors trained the cleaning crews and monitored their performance in person for a week to make sure that the crews cleaned properly. *Id.* at 23:9-:19, 25:18-26:18. Similarly, Herb Stewart—who is Defendants' Director of Quality Control and not an immediate supervisor—testified that, while he conducted orientations for Plaintiffs Robles and Ulloa at two restaurants, he otherwise did not supervise them. D.E. 52-5 at 65:17-66:5, 67:2-:4. Jorge Bautista, Stewart's counterpart, likewise did not recall meeting or

7

speaking with Vazquez during the period that she allegedly worked for Emmaculate. D.E. 53-1 at 74:3-:6.

Stewart, however, also conceded that Defendants' cleaning subcontractors were given detailed checklists on what to clean. *Id.* at 48:22-50:16. These checklists were based on the customers' specifications and contained detailed instructions on what was to be cleaned and how often to clean it. *Id.* at 49:3-:18; *see also, e.g.*, D.E. 69-4; D.E. 69-5; D.E. 70-1; D.E. 70-2. According to Stewart, the customers' specifications were broken down into further detail by Defendants before being passed along to those doing the cleaning. D.E. 52-5 at 49:20-50:4.

When an alleged employer provides "specific direction for how workers, particularly low-skilled workers, are to perform their jobs, courts have weighed the control factor in favor of employee status." *Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 579 (D. Md. 2008) (finding factors such as the provision of supervision of painters, instruction in what paint to use and how many coats to apply, and on-the-job training to be indicative of employee status). Similarly, the provision of written instructions and procedures for how to complete the job also indicates employee status. *See Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 307 (4th Cir. 2006) (finding an eight-page standard operating procedure document outlining job tasks indicative of employee status); *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 750 (N.D. Ill. 2011) (finding a policy and procedure handout coupled with close monitoring of workers' compliance with the procedures indicative of control). The provision of training likewise indicates an employee-employer relationship. *See Gate Guard Servs. L.P. v. Solis*, 2013 WL 593418, at *4 (S.D. Tex. Feb. 13, 2013) (noting the significance of training and observing that the non-provision of training indicates an independent-contractor relationship). Finally, supervision need not be constant to establish an employee-employer relationship. *See Brock v. Superior Care, Inc.*, 840 F.2d

1054, 1060 (2d Cir. 1988) (citing *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1383-84 (3d Cir. 1985)) ("An employer does not need to look over his workers' shoulders every day in order to exercise control.").

Here, the facts demonstrate that Defendants exercised substantial control over the manner of performing work. Defendants trained the cleaning crews in how to clean specific items, including what tools to use; they provided the crews with extensively detailed checklists of what to clean and how often to do so; they initially monitored the crews' performance on-site and in person for an entire week; and, although there is some dispute as to how often any particular supervisor visited and inspected a specific restaurant,[2] it is undisputed that Defendants' supervisors regularly supervised the cleaning crews' work. Viewed together, this all suggests that Defendants closely controlled the manner of Plaintiffs' work as an employer would. While Defendants—as all businesses to some degree—may certainly have been concerned with "customer satisfaction," Defendants manifested that concern through closely controlling and monitoring Plaintiffs' work habits and methods. Accordingly, the first factor weighs in favor of finding that Plaintiffs were "employees" under the FLSA.

2. Opportunity for Profit or Loss Depending on Managerial Skill

It is undisputed that Plaintiffs were paid on a per-job basis and could potentially increase their profit by taking on more jobs with Emmaculate. D.E. 56-2, ¶ 5; D.E. 68-1, ¶ 5. Similarly, it is undisputed that cleaning crews could hire extra individuals on their own and pay these individuals out of the total payment they received from Emmaculate—thereby potentially increasing the number

---

[2] Although Defendants have pointed to one first-line supervisor and two higher-level supervisors who either did not supervise, or do not recall supervising, Plaintiffs' activities, this is insufficient to create a material issue of fact as to Plaintiffs' testimony, especially when Plaintiffs have indicated that several other different individuals were involved in supervising their cleaning activities.

of jobs they could complete. *Id.* Each of these facts points towards Plaintiffs' status as independent contractors and not employees. *See Freund*, 185 F. App'x at 783. At the same time, however, Plaintiffs' opportunities for profit were constrained by Emmaculate to the extent that Emmaculate was solely responsible for entering into cleaning contracts with restaurants, and Emmaculate had the ultimate discretion in assigning cleaning crews to the restaurants. *See* D.E. 56-3, ¶¶ 7, 17; *see also Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 328 (5th Cir. 1993) (finding that an alleged employer's "control over determinants of customer volume" constrains an individual's opportunity for profit).

Defendants also contend that Plaintiffs could have increased their individual[3] opportunities for profit by working for other cleaning services, including Emmaculate's competitors. D.E. 56-1 at 9. But this fact extends beyond the scope of the present inquiry, which focuses on the nature of Plaintiffs' relationship with Defendants. *See Usery*, 527 F.2d at 1311 (explaining that the inquiry "gauge[s] the degree of dependence of alleged employees *on the business with which they are connected*" (emphasis added)); *see also Halferty v. Pulse Drug Co.*, 821 F.2d 261, 267-68 (5th Cir. 1987) ("Thus, it is not dependence in the sense that one could not survive without the income from the job that we examine, but dependence for continued employment."). Put another way, employees are generally free to increase their individual "profit" by taking on second jobs without undermining their FLSA-employee status with the first employer.

Turning to the second half of the inquiry on this factor, the Court notes that Defendants do not point to any opportunity for loss that Plaintiffs risked. The opportunity for loss must extend

---

[3] The Court notes that Defendants' contracts with its subcontractor entities include a non-competition clause that restricts the subcontractor entity from doing business with Emmaculate's competitors, or similar businesses, for the duration of the contract with Emmaculate and for twenty-four months thereafter. *See* D.E. 70-5 at 7. Defendants admit that the clauses do not apply to Plaintiffs as individuals, and Plaintiffs appear to concede this point, at least so far as an individual is not also a separate subcontractor entity with its own contract with Emmaculate. D.E. 56-2, ¶ 8; D.E. 68-1, ¶ 8.

beyond the mere threat of lost wages and must involve the risk of losing a capital investment. *See Lauritzen*, 835 F.2d at 1536; *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1345-46 (N.D. Ga. 2011). Beyond the occasional purchase of negligible cleaning supplies and tools, which is insufficient to present a risk of loss, Plaintiffs invested practically nothing but their labor in their cleaning work. *See Lauritzen*, 835 F.2d at 1536. To the extent that Defendants may contend that the back charges that they imposed on cleaning crews when customers were dissatisfied represent losses, *see* D.E. 56-1 at 9, the Court rejects this argument. Such back charges are not attributable to any discretionary managerial decision but, rather, are the result of poor cleaning performance.

When viewed as a whole, Plaintiffs' opportunities to increase their profits support the idea that they were independent contractors, but the absence of any real risk of loss suggests Plaintiffs were "employees." This factor is a wash.

3. Investment in Required Equipment or Materials and Employment of Workers

As discussed above, Plaintiffs were permitted to hire individuals on their own to accomplish their cleaning tasks but were not required to do so. D.E. 56-2, ¶ 5; D.E. 68-1, ¶ 5. During their fourteen-month tenure with Emmaculate, Plaintiffs Robles and Ulloa hired an individual only one time to help with their cleaning work. D.E. 56-2, ¶ 27; D.E. 68-1, ¶ 27. Plaintiffs' investment in additional labor was minimal—even aberrant—and not indicative of independence. *See Usery*, 527 F.2d at 1312 ("Occasional exercise of the right to hire helpers also has not been found sufficiently indicative of independence to allow a finding of nonemployee status.").

Further, Defendants concede that Plaintiffs' investment in cleaning supplies and tools was minimal for Robles and Ulloa and non-existent for Vazquez. *See* D.E. 56-1 at 10. At most, Plaintiffs provided their own transportation, by way of Robles's personal vehicle in the case of Robles and Ulloa, to the job sites. While an investment in a vehicle for transportation is a substantial

11

one, this factor is diluted when the vehicle is one used for personal purposes rather than primarily for business purposes. *See Molina*, 420 F. Supp. 2d at 1285 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998)). Because Plaintiffs' transportation here was by way of Robles's personal vehicle, it does not provide support for the conclusion that Plaintiffs were independent contractors.

As for cleaning supplies, Plaintiffs purchased only basic cleaning supplies when those supplies were not provided by the restaurants themselves. D.E. 56-2, ¶¶ 9, 39. Further, on one occasion, when Robles needed a more expensive piece of equipment—a pressure cleaner—to complete a job, Emmaculate loaned it to him, thereby relieving him of the need to make a capital investment in the equipment himself. D.E. 53-4 at 166:2-:4. Large out-of-pocket investments suggest independent contractor status while the purchase of only negligible items or labor itself points to the opposite conclusion. *See Lauritzen*, 835 F.2d at 1537; *Jaworski v. Master Hand Contractors, Inc.*, 2013 WL 1283534, at *4 (N.D. Ill. Mar. 27, 2013). Here, Plaintiffs made admittedly minimal purchases rather than large-scale investments in supplies and equipment. The lack of Plaintiffs' substantial investment in equipment and materials tips in the direction of finding employee status.

4. Whether the Service Rendered Requires Special Skills

As other courts have found, cleaning services such as those provided by Plaintiffs require no special skills. *See Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 770 (D. Md. 2008); *see also Usery*, 527 F.2d at 1314 ("Routine work which requires industry and efficiency is not indicative of independence and nonemployee status."). Defendants' arguments to the contrary are unpersuasive. To the extent that Defendants suggest experience is required to do Plaintiffs' work, D.E. 67 at 7, the Court does not agree that experience is, or is equivalent to, a specialized skill, and

Defendants point to no authority that suggests otherwise. *See Lauritzen*, 835 F.2d at 1537 (citing *Brock v. Lauritzen*, 624 F. Supp. 966, 969 (E.D. Wis. 1985) (holding that the development of occupational skill through experience "is no different from what any good employee in any line of work must do"). Put another way, one can quickly and easily develop experience at routine, unspecialized tasks.

Defendants also suggest that because a poorly cleaned restaurant could lead to health-inspection deficiencies, restaurant cleaning necessarily involves specialized skills. D.E. 56-1 at 10. This argument, however, addresses performance rather than skill. In short, highly skilled employees may still perform poorly. Defendants have offered no authority that restaurant cleaning is so distinct from other cleaning services that it requires a specialized set of skills. Accordingly, this factor weighs in favor of finding employee status.

5. Permanency and Duration of the Working Relationship

Plaintiff Vazquez had an admittedly short working relationship with Defendants—only ten days. D.E. 51-1, ¶ 49. Plaintiffs Robles and Ulloa, however, had a more long-term relationship with Emmaculate—from June 2010 to August 2011—that ceased when a payment dispute arose between Robles and Ulloa and Emmaculate. D.E. 56-2, ¶¶ 15, 26; D.E. 68-1, ¶¶ 15, 26; D.E. 53-4 at 35. More significantly, Robles and Ulloa worked for only Emmaculate during this period. D.E. 51-1, ¶ 56; D.E. 53-4 at 83:8-:11. The duration and exclusivity of Robles and Ulloa's relationship with Emmaculate points squarely at an employer-employee relationship, while the shorter duration of Vazquez's relationship does not.

On the other hand, the cleaning crews were paid by the job and were free to decline jobs even while accepting other jobs from Emmaculate. D.E. 56-2, ¶ 7; D.E. 68-1, ¶ 7; D.E. 53-4 at 75:23-76:5; D.E. 52-5 at 94:2-:11. The ability to readily reject jobs is not reflective of the permanency

found in an employee-employer relationship and supports finding an independent-contractor relationship. On balance, the duration and permanency factor tips slightly in favor of Defendants.

6. The Extent to Which the Service Is an Integral Part of the Alleged Employer's Business

Next, the Court considers the extent to which Plaintiffs' cleaning services were an integral part of Defendants' business. It is undisputed that Emmaculate is a "commercial cleaning business specializing in restaurant cleaning." D.E. 56-2, ¶ 1; D.E. 68-1, ¶ 1. As Plaintiffs provide the cleaning services that Defendants' offer, Plaintiffs' services are indisputably integral, if not essential, to Defendants' business. While Defendants attempt to cursorily dismiss this factor as "not determinative of one's employee's status," D.E. 56-1 at 11, the reality is that this factor informs the inquiry as much as any other factor listed here. *Freund*, 185 F. App'x at 784; *Scruggs v. Skylink, Ltd.*, 2011 WL 6026152, at *8 (S.D. W.Va. Dec. 2, 2011) ("Generally, the more integral the work, the more likely the worker is an employee, not an independent contractor." (citation omitted)). Consequently, this factor weighs strongly in favor of finding an employee relationship.

7. The Economic Reality

Upon consideration of the six factors above and the circumstances as a whole, the Court finds that Plaintiffs were dependent on Defendants in their economic relationship and are considered employees under the FLSA. The fact that Robles and Ulloa worked exclusively for Emmaculate during their fourteen-month association highlights Plaintiffs' economic dependency on Defendants. Further, Defendants' significant control and supervision of Plaintiffs' work habits and methods, Plaintiffs' minimal capital investments and nonexistent risk of loss, Plaintiffs' dependence on Emmaculate to find and engage restaurants to be cleaned, the lack of a need for specialized skills, and the integral and essential nature of Plaintiffs' services to Defendants' business all describe a relationship with the character of one between an employee and an employer, notwithstanding the

few indicia of independent-contractor status found on the record. Taken together, these facts demonstrate that Plaintiffs were not in business for themselves but were, instead, dependent on Defendants for their continued employment in the restaurant-cleaning business. Accordingly, Plaintiffs' motion for summary judgment is granted on this point, and Defendants' motion is denied.

**B. Willfulness Under the FLSA**

The FLSA provides two limitations periods for bringing a claim for unpaid wages: two years for ordinary violations or three years for "willful violations." 29 U.S.C. § 255(a). A violation of the FLSA is willful if an "employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)). "Reckless disregard" is defined as "the 'failure to make adequate inquiry into whether conduct is in compliance with the Act.'" *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008) (quoting 5 C.F.R. § 551.104). The employee bears the burden of proving willfulness by a preponderance of the evidence. *Id.* at 1162-63.

Plaintiffs assert that "it is clear that Defendants knew about the mandates of the FLSA and set up the business to avoid its requirements." D.E. 51 at 10. To support their assertion, however, Plaintiffs point to only Defendants' Redacted Operations Manual [D.E. 73-1]. *Id.* The Manual, among other things, notes that Emmaculate "utilizes subcontractors instead of direct employees" and describes the benefits that this arrangement provides, including that "[n]o Payroll timekeeping is needed." D.E. 73-1 at 6. Plaintiffs' Motion cites to no other facts on the record to establish willfulness.

The benefits highlighted in the Manual, however, are ones that would commonly result from an independent-contractor relationship, and, by itself, the use of independent contractors is not *per*

15

*se* a violation of the FLSA. Further, the Manual itself does not even mention the FLSA, and, on its own, is insufficient to establish willfulness. Finally, although the Court has concluded that Plaintiffs are employees for the purposes of the FLSA, the existence of any actual violation of the FLSA by Defendants is a question of fact that remains to be resolved. The Court, therefore, finds that Plaintiffs have failed to satisfy their burden of establishing willfulness at this stage of the proceedings.

Plaintiffs also cite to two cases that found misclassification of employees as independent contractors to be evidence of willfulness. D.E. 51 at 10 (citing *Armitage v. Dolphin Plumbing & Mech., LLC*, 510 F. Supp. 2d 763 (M.D. Fla. 2007) and *McLaughlin v. Stineco, Inc.*, 697 F. Supp. 436 (M.D. Fla. 1988)). Each of these cases is distinguishable. Procedurally, each case involved a bench trial where the Court could evaluate the credibility of the employers' testimony concerning their knowledge of the FLSA and could reach conclusions concerning the existence and nature of the actual violations. But more significantly, in each case, the defendants testified that they were aware of the provisions of the FLSA. *Armitage*, 510 F. Supp. 2d at 774; *Stineco*, 697 F. Supp. at 447. Although Plaintiffs suggest that "Defendants knew about the mandates of the FLSA," they cite to no evidence on the record that demonstrates Defendants' familiarity with the provisions of the FLSA. Without such evidentiary support, summary judgment would be inappropriate on this issue.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Plaintiffs' Motion for Partial Summary Judgment [D.E. 51] is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Motion is granted to the extent that Plaintiffs are considered employees under the FLSA. Plaintiffs' Motion is denied on the issue of willfulness. It is further **ORDERED** that Defendants' Motion for

Summary Judgment [D.E. 56] is **DENIED**.

**DONE** and **ORDERED** at Fort Lauderdale, Florida, this 3rd day of June 2013.

                                                ROBIN S. ROSENBAUM
                                                UNITED STATES DISTRICT JUDGE

Copies to:

The Honorable Barry S. Seltzer

Counsel of Record